## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| MICHAEL WESSON; THOMAS WOODS; and COMMONWEALTH SECOND AMENDMENT, INC. **Plaintiffs,**<br><br>v.<br><br>TOWN OF SALISBURY, a municipal corporation; THOMAS FOWLER, Chief of the Town of Salisbury Department of Police; TOWN OF NATICK, a Municipal corporation; JAMES HICKS, Chief of the Town of Natick Department of Police. **Defendants** | )<br>)<br>)<br>)<br>)<br>)<br>)  **Docket No. 1:13-cv-10469**<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Now Come the plaintiffs, by and through undersigned counsel, and submit their Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Summary Judgment.

THE PLAINTIFFS,
Michael Wesson, Thomas Woods and
Commonwealth 2nd Amendment, Inc.
By their attorneys,

/s/ Jeffrey T. Scrimo
Jeffrey T. Scrimo
Lynch Scrimo—Attorneys
PO Box 1787
68 Main St., 2nd Floor
Lenox, MA 01240
BBO# 649864
(P) 413-637-1300
(F) 866-230-7304
Jeff@LenoxAttorney.com

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

STATEMENT OF FACTS ..................................................................................................1

SUMMARY OF ARGUMENT ...........................................................................................4

    I. ISSUE.............................................................................................................................4

ARGUMENT .......................................................................................................................4

    II . RULE..........................................................................................................................4

        *A. The Second Amendment to the U.S. Constitution and Case Law.*.............................4

        *B. Massachusetts Law* .................................................................................................5

        *C. Standard of Review* .................................................................................................6

    III. ANALYSIS ...............................................................................................................8

        *A.*     *Plaintiffs Are Entitled To Second Amendment Rights Because Their Non-Violent Misdemeanor Offenses Do Not Make Them Similar to Felons and Violent Misdemenants*.................8

            1. History and Tradition of Restrictions on Violent Criminals.............................9

            2. The Legislative History ..................................................................................10

            3. A Review of The Scientific Literature.............................................................13

        *B.*     *Plaintiff's Second Amendment Right Includes the Right to Purchase And Transport a Handgun To A Range to Maintain Proficiency* .................17

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

Andrews v. State, 50 Tenn. 165, 8 Am. Rep. 8,13 (1871)................................................ 21

Chief of Police of Shelburne v. Moyers, 16 Mass. App. Ct. 543 (1983)...................... 13

Commonwealth v. Davis, 369 Mass. 886, 890 (1976)...................................................... 5

District of Columbia v. Heller, 128 S.Ct. 2783 (2008)................................................. 4, 9

Ex parte Roque Cesar Nido Lanausse, No. KLAN201000562 (P.R. Cir. 2011)........... 21

Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011)................................................ 6, 8

Gowder v. City of Chicago, docket No. 1:11-cv-01304 (D.C. Illinois 2012) ................ 7

Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1252 (D.C. Cir. 2011)........ 7

Hertz v. Bennett, 751 S.E.2d 90 (Ga. 2013) .................................................................. 21

Hill v. State, 53 Ga. 472 (1874) ................................................................................... 22

McDonald v. City of Chicago, 130 S. Ct. 3020 (2010) ............................................... 5

Moore v. Madigan, 702 F.3d 933 (7th. Cir. 2012 ) ..................................................... 20

Nat'l Rifle Ass'n of Am., Inc. v. BATF, 700 F.3d 185, 194 (5th Cir. 2012) ............... 7

People v. Aguilar (Ill. 2013) ...................................................................................... 21

People v. Yanna, 824 N.W.2d 241 (Mich. Ct. App. 2012) .......................................... 21

Peruta v. County of San Diego, (9th Cir., February 13, 2014,) .................................. 8

See Schrader v. Holder, 704 F.3d 980 (2013) (D.C. Cir. 2013) ................................. 9

State v. Christian, 307 P.3d 429 (Ore. 2013) ............................................................. 21

State v. Shover, (Ohio Ct. App. Feb. 5, 2014) ............................................................ 21

United States v. Booker, 644 F.3d 12 (1st Cir. 2011) ............................................ 7, 8, 9

United States v. Chovan, 735 F.3d 1127 (9th Cir. 2013) ............................................ 6

United States v. Greeno, 679 F.3d 510 (6th Cir. 2012) .............................................. 7

United States v. Marzzarella, 614 F.3d 85, Note 8 (3rd Cir.) .................................... 22

United States v. Skoien, 614 F.3d 638 (7th Cir. 2010) ................................................ 8

## Statutes

18 U.S.C. § 922(g)(9) ........................................................................................ 7, 9, 10

M.G.L. § 131(d)(i)(e) .................................................................................................. 10

M.G.L. c. 140 § 131 .................................................................................................. 4, 5

M.G.L. c. 94C § 32L .................................................................................................. 11

M.G.L. c. 94C § 34 .................................................................................................... 11

 M.G.L. c. 140, § 129B ............................................................................................... 5

Maine Revised Statutes, Title 22 § 2383 .................................................................... 4

1991 Va. Ch. 649, § 18.2-250.1 .................................................................................. 3

M.G.L. c. 140, § 129B ................................................................................................ 3

M.G.L. ch. 140, § 131(d) ............................................................................................ 5

## Other

E. L. Abel, *Relationship between cannabis and violence: Review*, 84 Psychological Bulletin 193, 207 (1977) ............................................................................................................... 14

K.A. Miczek, et al., *Alcohol, drugs of abuse, aggression, and violence, in* Understanding and Preventing Violence, 401, (A.J. Reiss & J.A. Roth eds., 1994) ................................... 14

K.A. Miczek, et al., *Alcohol, drugs of abuse, aggression, and violence, in* Understanding and Preventing Violence: Social Influences 401, (A.J. Reiss & J.A. Roth eds., 1994) ................... 16

MASSACHUSETTS LEGISLATIVE DOCUMENTS (1997 & 1998) ........................................ 10

National Commission on Marihuana and Drug Abuse, Marihuana: A signal of misunderstanding § 1 (U.S. Government Printing Office. 1972) ........................................................... 14

Report of the Indian Hemp Drugs Commission, 1893-94 § 1 (Government Central Printing Office 1894) ............................................................................................................... 13

S. P. Taylor, et al., *Effects of alcohol and delta-9-tetrahydrocannabinol on human physical aggression*, 2 Aggressive Behavior 153 (1976). ..................................................... 15

T. Bennett, et al., *The statistical association between drug misuse and crime: A meta-analysis*, 13 Aggression and Violent Behavior 107 (2008)...................................................................... 14

W. Pedersen & T. Skardhamar, *Cannabis and crime: findings from a longitudinal study*, 105 Addiction (2010). ......................................................................................................... 15

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Defendants enforce M.G.L. c. 140 § 131(d)(i)(e), which is part of a Massachusetts gun licensing scheme. Plaintiffs, Michael Wesson ("Wesson") and Thomas Woods ("Woods"), have been denied their fundamental Second Amendment rights to purchase, possess and carry a handgun in their homes for self-defense, as well as to transport a handgun to a range to maintain proficiency by action of § 131(d)(i)(e).

In 1973, Plaintiff Wesson pled guilty without a lawyer to one count of the misdemeanor offense of simple Possession of Marijuana in the state of Maine. As a result, a guilty was entered and a $300 fine was imposed. On May 12, 1982, Plaintiff Thomas Woods pled guilty without a lawyer to one count of the misdemeanor offense of simple Possession of Marijuana in the Commonwealth of Virginia. As a result, a guilty was entered and a $10 fine was imposed. Other than the non-violent misdemeanor conviction more than forty and thirty years ago respectively, neither plaintiff has any other disqualifying criminal infractions, and each has led a successful professional and personal life. Both are law-abiding and responsible persons.

Plaintiffs each seek a Massachusetts License to Carry ("LTC") so they can purchase, possess and carry a handgun inside their homes for self-defense, as well as transport the handgun to a range to maintain proficiency. Solely as a result of their non-violent misdemeanor convictions, however, M.G.L. c.140 §131(d)(i)(e) imposes a lifetime ban preventing them from ever possessing a handgun, even in their own homes. For the reasons set forth below, Plaintiffs argue that as-applied to each of them, the lifetime handgun ban imposed by §131(d)(i)(e) violates their rights under the Second Amendment of the U.S. Constitution.

### STATEMENT OF FACTS

Plaintiff Wesson was camping with his wife and some friends in the North Maine Woods on September 4, 1973, when a forest ranger walking around the sites at night saw him smoking a

"joint" around the campfire. The ranger gave Mr. Wesson a summons to appear for a charge of marijuana possession. On September 6, 1973, Mr. Wesson dutifully appeared in the Maine District Court located in Dover Foxcroft without an attorney. Mr. Wesson pled guilty to one charge of simple Possession of Marijuana. The maximum potential penalty for the charge under Maine law in 1973 was eleven months in jail or a $1000 fine.[1] See 1973 version of M.R.S. Title 22 § 2383 attached as Ex. M. The Court imposed a $300 fine, which Mr. Wesson paid. Following his 1973 conviction, Mr. Wesson went on to have a successful personal and professional life. SMF ¶¶ 8-11, 25-30.

In 1993, Mr. Wesson's License to Carry Firearms was not renewed by the Commonwealth due to a Massachusetts lifetime ban on the possession of a handgun, imposed by M.G.L. c. 140 § 131(d)(i)(e), on anyone that has ever in their life been convicted of possession of a controlled substance, including the misdemeanor offense of Possession of Marijuana. Mr. Wesson applied for and was granted a Massachusetts Firearms Identification card in 1993, and renewed it in the usual course, including his most recent renewal on August 21, 2012. Desiring to have a license to possess and carry a handgun in his home for self-defense, Mr. Wesson applied for a Massachusetts Permit to Purchase on January 26, 2013. On or about March 12, 2013, Mr. Wesson's application for a Permit to Purchase was also denied due to his 1973 conviction for marijuana possession. SMF ¶¶ 15-17.

On May 12, 1982, Plaintiff Woods received a Summons to Appear in a Norfolk, Virginia court on a charge of simple Possession of Marijuana. Mr. Woods was twenty-one years old and was on active duty in the United States Navy. The Norfolk police had showed up at a hotel room due to a sound complaint where Mr. Woods and a few shipmates were entertaining some local ladies. When the police arrived, they saw a small bag of marijuana on the bed. Mr. Woods took responsibility for the bag of marijuana for the group. He appeared in court a few times over the following days without an attorney, but the officer did not show up. On May 27, 1982, Mr. Wesson again showed up to court, but the officer again did not appear. Mr. Woods informed the judge that he was being deployed, and that he was not sure when he would be returning to port. Mr. Woods remembers the judge telling him that it was his "lucky day" and the case was "dismissed," but a $10 fine and a guilty was entered on his record. The maximum potential penalty for the offense was thirty days in jail or a fine up to $500. SMF ¶¶ 12-14; See also 1991

---

[1] Maine decriminalized marijuana possession two years later in 1975. See M.R.S. Title 22 § 2383.

Va. Ch. 649, § 18.2-250.1, attached as Ex. F.   Mr. Woods is now fifty-two years old and went on to have a successful military and private sector career after his 1982 $10 sentence for Marijuana Possession. <u>SMF</u> ¶¶ 21-24.

In June of 2011, Mr. Woods applied for a Massachusetts License to Carry so that he could possess and carry a handgun for self-defense purposes in his home. The Natick Police, however, would not process his application because M.G.L. c. 140 § 131(d)(i)(e) imposed a statutory disqualification caused by his thirty-year old marijuana possession conviction in Virginia. Mr. Woods applied for and was granted a Massachusetts Firearms Identification card in August 2011. On or about February 6, 2013, Mr. Woods applied for a Massachusetts Permit to Purchase so that he might possess a handgun in his home for self-defense purposes. On or about February 13, 2013, the Natick Police Department advised Mr. Woods that they could take no action on his PTP application because the Firearms Record Bureau had reportedly phased out issuing PTPs in the 1980s, and because the PTP "is not an option" due to his conviction for marijuana possession. <u>SMF</u> ¶¶ 18-20.

The Commonwealth of Massachusetts requires its residents to obtain either a License to Carry Firearms or an FID Card combined with a Permit to Purchase firearms in order to possess firearms in their homes. <u>See Plaintiffs' Complaint</u> attached as Ex. A; <u>FOIA Request/Response</u>, attached as Ex. N (showing that zero PTPs have been issued since 2006); <u>Memorandum from CHSB</u> attached as Ex. O; <u>Official Website of Mass. Office of Public Safety</u> attached as Ex. P. As stated above, the defendants denied Plaintiffs a LTC and PTP because of the lifetime ban imposed by M.G.L. c. 140 § 131(d)(i)(e). However, interestingly, Plaintiffs were each issued a Massachusetts Firearms Identification Card pursuant to M.G.L. c. 140, § 129B, and thus Plaintiffs are not barred from possessing some form of a non-large capacity gun in Massachusetts, including guns more powerful than handguns (though less preferred for self-defense in the home) such as pump action shotguns and high powered rifles.

Plaintiffs seek a Massachusetts License to Carry so that they may possess a handgun in their homes for the purposes of self-defense, and also may travel to a range or other legal location to maintain proficiency.

## SUMMARY OF ARGUMENT

### I. ISSUE

How small an error of judgment can a man make once in his lifetime to justify the government in depriving him for the rest of his life of a fundamental, individual right enshrined in the Bill of Rights of the United States Constitution?

The issues presented in the present matter are limited and specific:  1) As applied to Plaintiffs, the lifetime handgun ban imposed on them by M.G.L. c. 140 § 131(d)(i)(e) based on non-violent misdemeanor marijuana possession offenses more than thirty or forty years ago, deprives each Plaintiff of his fundamental right to possess and carry a handgun inside his home for self-defense purposes.; and 2)  The lifetime ban imposed by M.G.L. c. 140 § 131(d)(i)(e) also unconstitutionally bars Plaintiffs from exercising their Second Amendment right to "keep" and "bear" arms by barring them from purchasing and transporting those constitutionally protected firearms to a range or other lawful location for purposes of maintaining proficiency.

## ARGUMENT

### II . RULE

*A. The Second Amendment to the U.S. Constitution and Case Law.*

On June 26, 2008, the Supreme Court of the United States held in <u>District of Columbia v. Heller</u>, 128 S.Ct. 2783 (2008) that the right of individuals to keep and bear arms for self-defense is enshrined in the Second Amendment to the United States Constitution.  As specifically stated by the <u>Heller</u> Court: "we hold that the District's ban on *handgun possession* in the home violates the Second Amendment. . .. Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must . . . issue him a license to carry [a handgun] in the home." <u>Id.</u> (emphasis added).  The <u>Heller</u> Court put particular emphasis on handguns specifically being covered by the Second Amendment right because they are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." <u>Heller</u>, 128 S.Ct. at 2818 (2008).  On June 28, 2010, the Supreme Court of the United States held in <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020 (2010), that the Second Amendment right to keep and bear arms restrains state and local governments through incorporation in the Fourteenth Amendment.

### B. *Massachusetts Law*

The Massachusetts legislature has enacted no relevant amendments to M.G.L. c. 140 § 131 subsequent to the Supreme Court issuing its Heller and McDonald holdings in 2008 and 2010. At the time of the enactment of the 1998 Massachusetts gun licensing amendments, the Massachusetts legislature and Supreme Judicial Court were operating under the mistaken assumption that

> the [Second] amendment inhibits only the national government, not the States. . .. The chances appear remote that this [Second] amendment will ultimately be read to control the States, for unlike some other provisions of the Bill of Rights, this is not directed to guaranteeing the rights of individuals, but rather, as we have said, to assuring some freedom of State forces from national interference. Commonwealth v. Davis, 369 Mass. 886, 890 (1976).

The relevant provisions of the Massachusetts gun licensing scheme, created under a now defunct "collective rights" theory of the Second Amendment, are set forth in detail in Plaintiffs' Complaint, and so are not all set forth again here. See Plaintiffs' Complaint. In summary, though, the Massachusetts gun licensing scheme establishes three classes of license relative to possessing "handguns" or other "large capacity" guns: 1) Class A License to Carry ("LTC-A"), 2) Class B License to Carry ("LTC-B"), and 3) Firearm Identification Card ("FID") plus an additional Permit to Purchase ("PTP"). A person must be issued one of the three above-listed licenses in order to lawfully possess and carry a handgun or other "high capacity" firearm in their home in Massachusetts. See Statutes set forth in Plaintiff's Complaint, attached as Ex. T; See also Massachusetts Exec. Office of Public Safety website, attached as Ex. P. Under M.G.L. ch. 140, § 131(d), and 131A, Massachusetts residents apply for LTCs, FIDs, and/or PTPs from the police chief of the town or city where they reside or have a place of business.

Under M.G.L. c. 140 § 131(d)(i)(e), a person convicted of a non-violent misdemeanor possession marijuana offense[2] must be denied a Massachusetts LTC-A and/or LTC-B, regardless of the time frame in which the conviction occurred, because he or she "has, in any state or

---

[2] Interesting, there is an exception to this categorical handgun ban for people convicted in Massachusetts under the pre-amended Massachusetts criminal marijuana possession statute. See M.G.L. c. 94C, § 34; Chief of Police of Shelburne v. Moyers, 16 Mass. App. Ct. 543 (1983). Both Wesson and Woods were convicted in states other than Massachusetts, so the exception to the categorical handgun ban does not apply to them. This handgun ban exception is discussed in further detail below.

federal jurisdiction, been convicted . . .of a violation of any law regulating the *use, possession* or sale of controlled substances as defined in section 1 of chapter 94C. . .." Id. (emphasis added). As interpreted by the Commonwealth, a PTP may "be granted only to one capable of being licensed and qualified to be granted a license to carry ("LTC") under M.G.L. c. 140 § 131." Memorandum from Director of Massachusetts Firearm Support Services, CHSB, attached hereto as Exhibit O. Accordingly, a person disqualified by M.G.L. c. 140 § 131(d)(i)(e) is permanently barred by Massachusetts law from obtaining a LTC-A, LTC-B, and PTP, and is therefore permanently barred from possession of a handgun in their home for the purposes of self-defense.

### C. Standard of Review

The first step for this Honorable Court in reviewing the present as-applied challenge to M.G.L. c. 140 § 131(d)(i)(e) must be to determine the proper standard of review. To review Second Amendment challenges to restrictions, the Heller court utilized a two-step process: 1) The court must determine whether the restricted activity falls within the scope of the Second Amendment; and 2) If it does, the court must determine whether the restriction "infringes" on the Second Amendment right. See Peruta v. County of San Diego, no. 10-56971, 2014 U.S. App. LEXIS 2786 (9th Cir., February 13, 2014) (citing Ezell v. City of Chicago, 651 F.3d 684, 700 (7th Cir. 2011); United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013), Nat'l Rifle Ass'n v. BATF, 700 F.3d 185, 194 (5th Cir. 2012) ("A two-step inquiry has emerged as the prevailing approach."); United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012); Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1252 (D.C. Cir. 2011)).

The lifetime handgun ban imposed on Plaintiff under § 131(d)(i)(e) implicates the core Second Amendment right to possess a handgun in Plaintiff's home for defense of hearth and home. Therefore, the present Court should move to the second stage and determine whether the right has been infringed. The Court in Heller held that the absolute ban on handgun possession for self-defense in the home "would fail constitutional muster" under "*any* of the standards of scrutiny" applied to enumerated constitutional rights. Heller, 554 U.S. at 628-29 (emphasis added). The Heller Court expressly left for 'future evaluation' the precise level of scrutiny to be applied to laws trenching upon Second Amendment rights." United States v. Booker, 644 F.3d 12, 22 (1st Cir. 2011) (quoting Heller, 554 U.S. at 626, 634-35). Nevertheless, the Heller Court expressly declined to apply an "interest-balancing" approach. After the Supreme Court's analyses

6

in <u>Heller</u> and <u>McDonald</u>, the District Court in <u>Heller v. Dist. of Columbia</u>, 670 F.3d 1244 (D.C. Cir. 2011)(Heller II) opined in extensive detail that, based upon <u>Heller I</u> and <u>McDonald</u>, there is "little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." <u>Heller II</u>, 670 F.3d at 1271 (Kavanaugh, J., dissenting); quoted from <u>Gowder v. City of Chicago</u>, docket No. 1:11-cv-01304 (D.C. Illinois 2012); See also <u>Peruta v. County of San Diego</u>, no. 10-56971, 2014 U.S. App. LEXIS 2786 (9th Cir., February 13, 2014) ("...the <u>Heller</u> and <u>McDonald</u> Courts were hardly shy: we must consult 'both text and history.'").

In <u>United States v. Skoien</u>, 614 F.3d 638 (7th Cir. 2010), the Seventh Circuit considered a Second Amendment challenge to prosecution under 18 U.S.C. § 922(g)(9), which prohibits possession of firearms by persons convicted of a domestic-violence misdemeanor. In <u>Skoien</u>, the Court determined that the appropriate level of scrutiny to be applied was a "form of strong showing," because the Second Amendment claim was not being made by a "law-abiding, responsible citizen," the case did not "involve the central self-defense component of the right." <u>Ezell v. City of Chicago</u>, 651 F.3d 684, 708 (7th Cir. 2011)(citing <u>Skoien</u>, 614 F.3d at 645). In <u>Ezell v. City of Chicago</u>, however, the Court found that the plaintiffs were "the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under <u>Heller</u>, and their claim comes much closer to implicating the core of the Second Amendment right. . . suggesting that a more rigorous showing than that applied in <u>Skoien</u> should be required, if not quite 'strict scrutiny.'" <u>U.S. v. Skoien</u>, 651 F.3d at 708.

In <u>United States v. Booker</u>, 644 F.3d 12, 22 (1st Cir. 2011), the First Circuit, like the Seventh Circuit in <u>Skoien</u>, added convicted domestic violence misdemeanants to the list of individuals that could be categorically denied their Second Amendment rights. The <u>Booker</u> Court relied on analysis performed by the <u>Skoien</u> Court and quoted heavily from the <u>Skoien</u> decision. Like the <u>Skoien</u> Court, <u>Booker</u> noted that the criminal defendant appellants in that case "manifestly are not 'law-abiding responsible citizens." <u>United States v. Booker</u>, 644 F.3d at note 17. Immediately after noting the non-law-abiding nature of the criminal defendants in that case, the First Circuit concluded, "as did the Seventh Circuit, that a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." <u>Id.</u> 25.

In the present matter, the Court is presented with "law-abiding responsible citizens"

whose "core" right to possess a handgun in their home for self-defense is directly affected. Plaintiffs are "law-abiding responsible citizens." See Schrader v. Holder, 704 F.3d 980 (2013) (D.C. Cir. 2013)(if Appellant only had one conviction for a fist fight forty years ago and no other encounter with the law, "we would hesitate to find Schrader outside the class of 'law abiding, responsible citizens' whose possession of firearms is, under Heller, protected by the Second Amendment."). In the present case, Plaintiffs have no other disqualifying criminal convictions other than the non-violent misdemeanor marijuana possession charge. They have lived successful and productive lives and contributed to society. MF ¶¶ 21-29. Accordingly, this Honorable Court should analyze the M.G.L. c. 140 § 131(d)(i)(e) lifetime handgun ban through "text, history, and tradition" or, at a minimum, as indicted in Ezell, something more rigorous than the scrutiny applied in Skoien or Booker, "if not quite "strict scrutiny." Therefore, the Commonwealth has the burden of establishing at least a strong public interest for its lifetime handgun ban on Plaintiffs, and must establish a close fit between the legislation and its broad application to Plaintiffs to justify such a substantial encumbrance on individual rights.

**III. ANALYSIS**

As applied to Plaintiff in this matter, § 131(d)(i)(e) cannot survive constitutional scrutiny under a "text, history and tradition" test, strict scrutiny, or a "strong showing" review. To deprive Plaintiff of his Second Amendment right, the Commonwealth must rely on the often quoted Heller footnotes stating that the core Second Amendment right should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill. . .," and that these "presumptively lawful regulatory measures" are examples and "does not purport to be exhaustive." U.S. v. Booker, 644 F.3d 12, 23 (1st Cir. 2011) citing District of Columbia v. Heller, 554 US. 570, 627 n.26 (2008). As established below, however, Plaintiff does not fall under the felon or violent misdemeanant categories for firearm disenfranchisement.

   A. *Plaintiffs Are Entitled To Second Amendment Rights Because Their Non-Violent Misdemeanor Offenses Do Not Make Them Similar to Felons and Violent Misdemenants.*

In the present matter, the government has the burden to establish that Plaintiff's non-violent misdemeanor convictions over forty or thirty years ago for Possession of Marijuana places them under the rubric of "felons" or the "violent domestic misdemeanant" categories sufficient to justify the § 131(d)(i)(e) lifetime handgun ban. Because there are no known federal or Massachusetts cases on point, the Court should look to the distinguishable, but instructive,

discussion in <u>U.S. v. Booker</u>, 644 F.3d 12 (1st Cir. 2011).

In <u>Booker</u>, the First Circuit addressed the constitutionality of federal statute 18 U.S.C. §922(g)(9), a "law that prohibits individuals convicted of a 'misdemeanor crime of domestic violence from possessing, shipping, or receiving firearms." <u>U.S. v. Booker</u>, 644 F.3d at 13. Although the present case is distinguishable in that it does not involve domestic violence, or any violence at all, Booker is instructive for the purpose of determining the method applied by the First Circuit in reviewing the constitutionality of a categorical ban on gun ownership for convicted misdemeanants.

To reach its conclusion that 18 U.S.C. § 922(g)(9) satisfied the requisite "strong showing," and therefore did not infringe on the Second Amendment by prohibiting domestic violence misdemeanants from possessing firearms, the <u>Booker</u> Court looked to three supporting sources: 1) The history and tradition of firearm restrictions on violent criminals; 2) The legislative history supporting the purpose of prohibiting domestic violence; and 3) Scientific and statistical evidence correlating the domestic relationships and abuse with gun violence.

<u>1. History and Tradition of Restrictions on Violent Criminals</u>

Although Plaintiffs are convicted misdemeanants, utilizing the same analysis performed by the <u>Booker</u> Court demonstrates that the government cannot make a "strong showing, necessitating a substantial relationship between the restriction and an important governmental objective" sufficient to overcome the as-applied constitutional challenge to § 131(d)(i)(e) in the present case. In <u>Booker</u>, the First Circuit relied on the history and tradition of firearm prohibitions of violent criminals to support its conclusion that,

> § 922(g)(9) fits comfortably among the categories of regulations that *Heller* suggested would be "presumptively lawful." 554 U.S. at 627 n. 26,128 S.Ct. 2783. Section 922(g)(9) is, historically and practically, a corollary outgrowth of the federal felon disqualification statute. — Moreover, in covering only those with a record of violent crime, § 922(g)(9) is arguably more consistent with the historical regulation of firearms than § 922(g)(1), which extends to violent and nonviolent offenders alike.

Additionally, the <u>Booker</u> Court found that,

> Section 922(g)(9) finds its animating interest in keeping guns away from people who have been proven to engage in violence with those with whom they share a domestically intimate or familial relationship, or who

9

live with them or the like. This interest, which appears plainly on the face of the statute and is borne out by its legislative history, *see* 142 Cong. Rec. S8832 (statement of Sen. Lautenberg), is undeniably important. Id. at 25 (citations omitted).

In contrast to the Defendants in Booker, Plaintiffs did not commit any crime of violence at the time of their possession offenses or at any time since the offenses. The elements of the crime of Possession of Marijuana in Massachusetts and Maine are identical and neither has violence, or harm or an attempt to commit harm as an element of the crime. Compare M.R.S. Title 22 § 2383, 1991 Va. ALS 649 and M.G.L. c. 94C § 34, attached as Exhibits F, M & S. Plaintiffs were each convicted of a misdemeanor crime that involved no violence or direct threat to the safety of the public. Plaintiffs, as non-violent misdemeanants, are in a much different category than the violent misdemeanants in Booker, in that there is no evidence in the present case showing that Plaintiffs are the type of violent citizens that "fit comfortably" among the traditional or historical federal felon prohibition. The element of violence is a distinguishing factor between a domestic violence misdemeanor offense and a misdemeanor offense for merely possessing marijuana thirty or forty years ago.

2. The Legislative History

As set forth above, the Booker Court also relied on the legislative history of § 922(g)(9) to demonstrate that the important governmental interest in preventing armed violence was the reason for the statute. According to the First Circuit, this interest "appears plainly on the face of the statute and is borne out by its legislative history, *see* 142 Cong. Rec. S8832 (statement of Sen. Lautenberg), is undeniably important." Id.

No such legislative history or other support for a lifetime ban due a non-violent misdemeanor possession conviction exists to support the § 131(d)(i)(e) ban at question in the present case. A review of the legislative history of § 131(d)(i)(e) yields no evidence that the legislative purpose of the lifetime ban was to stem violent behaviors by people convicted of marijuana possession in the distant past. See, generally, MASSACHUSETTS LEGISLATIVE DOCUMENTS, at Volumes 1910-1999 (1997), 5550-5669 (House, 1998), 5800-5889(House, 1998), and 2200-2289 (Senate, 1998). Unlike the legislative history of 18 U.S.C. § 922(g)(9), there is no demonstrable link between §131(d)(i)(e)'s lifetime ban on non-violent marijuana possession and a specifically stated legislative goal to prevent violence from people with decades old marijuana convictions.

On the contrary, a review of the Massachusetts gun licensing statutory scheme and Massachusetts case law demonstrates that the lifetime ban imposed on Plaintiffs for a single non-violent marijuana possession cannot rationally be said to be tailored to prevent armed violence to the community by persons convicted of marijuana possession many years prior. Firstly, by action of M.G.L. c. 94C § 34 (the criminal Massachusetts marijuana possession statute, prior to amendment) if Plaintiffs had been convicted in Massachusetts of the exact same possessory offense, they would not suffer a lifetime handgun ban at all. M.G.L. c. 94C § 34 mandates that

> Any conviction, the record of which has been sealed under this section, *shall not be deemed a conviction for purposes of any disqualification or for any other purpose....* any person who is convicted for the first time under this section for the possession of marihuana . . . and who has not previously been convicted of any offense pursuant to the provisions of this chapter, or any provision of prior law relating to narcotic drugs or harmful drugs as defined in said prior law shall be placed on probation.... Upon successful completion of said probation, the case *shall* be dismissed and records *shall* be sealed. Id. (emphasis added).

Massachusetts courts have confirmed that this statutory language prohibits firearms licensing authorities from utilizing a one-time marijuana conviction as a statutory bar under § 131(d)(i)(e) to issuance of a LTC. See Chief of Police of Shelburne v. Moyers, 16 Mass. App. Ct. 543 (1983)("The chief of police does not question the correctness of the judge's ruling that the provisions of G. L. c. 94C, Section 34, second par., removed the defendant's conviction as a disqualification to receive the license (LTC) applied for.")  Massachusetts continued this state of the law by recently enacting M.G.L. c. 94C § 32L "An Act Establishing A Sensible State Marihuana Policy," which mandates that "neither the Commonwealth nor any of its political subdivisions or their respective agencies, authorities or instrumentalities may impose any form of penalty, sanction or disqualification on an offender for possessing an ounce or less of marihuana." Id.

Incredibly, Plaintiffs are statutorily barred for life from possessing a handgun for self-defense in their homes due to one-time marijuana convictions 40 and 30 years ago, while people convicted of the same offense in Massachusetts at the same time, or even just a few years ago, or who walk around openly possessing marijuana in public today suffer no Massachusetts firearms ban at all. This is only because Plaintiffs were not convicted under 94C § 34, but under the

11

Maine or Virginia possession statutes.[3] The Commonwealth cannot claim that this arbitrary and irrational result supports a strong showing of a substantial relationship between the restriction and an important governmental objective. Surely the Commonwealth does not claim that Plaintiffs are more inclined toward armed violence than the other people convicted here in Massachusetts because forty years ago Wesson had marijuana while camping in the woods in Maine instead of in the Berkshires, or because Woods thirty years ago had some marijuana while waiting in a Virginia port for Navy deployment instead of relaxing at a Cape Cod beach resort.

Additionally, the Commonwealth cannot demonstrate a strong showing of a substantial relationship between the handgun ban and an important governmental objective of keeping guns out of the hands of violent and dangerous people, because the statutory scheme permits such people to possess even more powerful (albeit less useful for self-defense in the home) guns than handguns within five years of their conviction. M.G.L. c. 140 § 128B provides that:

> A firearm identification card shall be issued and possessed subject to the following conditions and restrictions . . . unless the applicant has, in any other state or federal jurisdiction, been convicted of (e) a violation of any law regulating the use, possession or sale of controlled substances, as defined in section 1 of chapter 94C including, but not limited to, a violation under said chapter 94C; provided, . . . if the applicant has been so convicted or adjudicated or released from confinement, probation or parole supervision for such conviction or adjudication, whichever is last occurring, not less than five years immediately preceding such application, such applicant's right or ability to possess a non-large capacity rifle or shotgun shall be deemed restored in the commonwealth with respect to such conviction or adjudication and such conviction or adjudication shall not disqualify such applicant for a firearm identification card. Id. at §129B(1)(ii)(e).

In other words, although the Commonwealth wants to ban Plaintiffs for life from having a handgun inside their homes, by statutory right they can not only possess twelve gauge shotguns and high powered rifles, but they can legally take them outside their homes and into the public sphere. By nature of the fact that Plaintiffs have been issued an FID card, and Plaintiff Wesson formally had an MA LTC before the 1998 law change, the legislature must be acknowledging

---

[3] Neither Maine nor Virginia have equivalent sealing statutes, nor would they be binding on Massachusetts licensing authorities if they did. See 16 M.R.S.A. § 611-13 (Maine has no "conviction" sealing provision); See Virginia Code § 19.2-392.2 (Virginia hsd no "conviction" sealing provision).

Plaintiffs are not a risk as dangerous persons like federal felons or violent domestic misdemeanants. At the same time, however, § 131(d)(i)(e) prohibits Plaintiffs from possessing handguns, which are constitutionally protected arms and in the words of the Heller Court are, "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." Heller, 128 S.Ct. 2783, 2818 (2008). At a very minimum, the Commonwealth must provide some strong showing why Plaintiffs should be prohibited from handgun ownership inside their homes when they are already permitted to possess more powerful rifles and shotguns in the public sphere, but which are generally not as desired for defense inside the home.

### 3. A Review of The Scientific Literature

Finally, a review of the scientific and statistical literature demonstrates that, unlike the Booker domestic violence misdemeanants, there is no known correlation between possessing marijuana thirty or forty years ago and an increased propensity toward armed violence today. Even reviewing the correlations between marijuana use and violence in a shorter time frame than forty or thirty years reveals no such correlation.

Through the end of the 20th century, all major studies and reviews of the empirical literature had concluded that, at worst, marijuana has little or no effect on violence and aggression, but may actually have a suppressive effect. As early as 1894, based on interviews of over 1200 people in Bengal, India, the *Report of the Indian Hemp Drugs Commission* concluded that

> moderate use practically produces no ill effects ... The injury done by the excessive use is, however, confined almost exclusively to the consumer himself; the effect on society is rarely appreciable. It has been the most striking feature in this inquiry to find how little the effects of hemp drugs have obtruded themselves on observation ... facts which combine to show most clearly how little injury society has hitherto sustained from hemp drugs. Report of the Indian Hemp Drugs Commission, 1893-94 § 1 (Government Central Printing Office 1894).

In 1938, the New York Academy of Medicine undertook several studies and a systematic review of the evidence on the effects of marijuana use in New York City, at the request of Mayor LaGuardia. The resulting "LaGuardia Report" was released in 1944. Among the conclusions from their sociological data were "Marihuana is not the determining factor in the commission of major crimes . . .." In the summary of their clinical study, the Committee reported that, for the

13

marijuana users, the "personality changes ... demonstrate that the subject experiences ... less aggression."  The Marihuana Problem in the City of New York. (1944)

Several studies were commissioned by the federal government in the 1960s and early 1970s.  In 1972, the National Commission on Marihuana and Drug Abuse reviewed existing studies and concluded that the

> more rigorous studies of the relationship between marihuana use and violent crime suggest that marihuana users in the general population do not commit acts of aggression or violence significantly more frequently than do nonusers; that marihuana does not heighten aggressive tendencies in most users and may, in some cases, serve to reduce aggressiveness. . ..  National Commission on Marihuana and Drug Abuse, Marihuana: A signal of misunderstanding  § 1 (U.S. Government Printing Office. 1972).

Abel (1977) reviewed the literature again five years later, and included international data and several new studies.  While allowing for the possibility that cannabis might increase violent reactions in already at-risk individuals, such as those with prior violent histories, Abel concluded that "[t]he main impression from the available evidence is that in general, use of marijuana is not a major cause of aggression.  This conclusion is in agreement with the overwhelming opinion of all governmentally sponsored commissions that have been specifically mandated to study the relationship between cannabis and violence." E. L. Abel, *Relationship between cannabis and violence: Review*, 84 Psychological Bulletin 193, 207 (1977).

Finally, in the most comprehensive review to date, Miczek et al. (1994), summarized literature covering over 1500 animal and human studies that were conducted between 1893 and 1987, including anecdotal, case study, correlational, and experimental data.  Miczek et al. reported that "all major reviews of the literature on cannabis and human aggression and violence during the past two decades conclude that cannabis has no effect on or actually decreases various indices of aggression." K.A. Miczek, et al., *Alcohol, drugs of abuse, aggression, and violence*, *in* Understanding and Preventing Violence, 401, (A.J. Reiss & J.A. Roth eds., 1994).

Our best quantitative estimate of the association between marijuana and criminal offending in general comes from a meta-analysis by Bennett, Holloway, and Farrington (2008). See T. Bennett, et al., *The statistical association between drug misuse and crime: A meta-analysis*, 13 Aggression and Violent Behavior 107 (2008).  Averaged across ten previous studies conducted between 1981 and 2001, they found that marijuana users were about 50% more likely

14

than non-users to offend.  However, some of these studies included drug offenses, and it is trivial
that marijuana use is "correlated with" criminal behavior, given that *every* marijuana use was
considered criminal behavior.  This inflates the apparent association, and this part of the
association could be eliminated entirely by legalizing marijuana.

This distinction was investigated explicitly by Pedersen and Skardhamar (2010) in a
longitudinal study of 1,353 young people from ages 13 to 27.  See, W. Pedersen & T.
Skardhamar, *Cannabis and crime: findings from a longitudinal study*, 105 Addiction  (2010).
Those authors found a statistically significant correlation between marijuana use and crime;
however, when the authors restricted their analysis to non-drug crime they found that the
correlation was non-significant.  The authors concluded,

> At first glance, there appeared to be a robust association between
> cannabis use and subsequent criminal involvement, even after
> extensive control for confounding factors.  However, a considerable
> proportion of crime charges in adolescence and young adulthood are
> related to use, possession, smuggling and distribution of drugs.
> When all drug-specific charges were excluded from our dependent
> variable, the association between cannabis use and later criminal
> charges was no longer statistically significant.  Thus, from our
> findings there is no evidence that use of cannabis—or any other
> substances—is associated with increased risk of subsequent non-
> drug-specific criminal charges, such as criminal gain or violence.
> Id. at 115.

To determine whether marijuana use *causes* aggression or violence, one must
experimentally manipulate marijuana use and observe differences, if any, in aggression or
violence.  Experimental research also has the advantage of allowing assessment of the effects of
marijuana, or its active ingredient, $\Delta^9$-tetrahydrocanabinol (THC), during the intoxication
("acute") period.

Experimental drug research is difficult to conduct with human subjects, because of legal
constraints, ethical restrictions, and logistical challenges.  As a consequence, very few studies
using laboratory measures of behavioral aggression have been reported in the literature.

In one such study, a placebo, a low dose of THC, or a high dose of THC, was
administered to three groups of ten young men.  See, S. P. Taylor, et al., *Effects of alcohol and
delta-9-tetrahydrocannabinol on human physical aggression*, 2 Aggressive Behavior 153 (1976).
The subjects then separately played a competitive reaction time game in which they received

unpleasant electric shocks, and believed (falsely) that they were also delivering shocks to their competitors. Aggressive behavior was measured as the level of shock that the participants believed they were delivering to their competitors. The mean shock level decreased from the placebo (4.0) to the low-dose (3.6) to the high-dose (2.8) conditions, suggesting that increasing marijuana dosage may have decreased aggression (linear effect size $r = -.26$). See Id.

In a follow-up study, Myerscough and Taylor administered one of three dosages of THC, again to three groups consisting of ten young men each, who played the same competitive reaction time game. See, R. Myerscough & S. Taylor, *The effects of marijuana on human physical aggression*, 49 Journal of Personality and Social Psychology 1541 (1985). As in the previous study, aggressive behavior decreased with dosage. The authors concluded that "[t]he results of this study .... are congruent with a growing consensus among drug investigators that marijuana does not instigate, precipitate, or enhance aggressive behavior." Id. at 1545.

Hundreds of experimental studies have been conducted on the causal effects of marijuana on aggression and violence in animals. See, generally, K.A. Miczek, et al., *Alcohol, drugs of abuse, aggression, and violence, in* Understanding and Preventing Violence: Social Influences 401, (A.J. Reiss & J.A. Roth eds., 1994). Of course, animal research has the disadvantage that we can never be sure that the results from one species will generalize to other species—including humans—until they are replicated in those other species.

The vast literature is, however, largely consistent in its conclusions across species: THC decreases attack and threat behavior, and increases submissive and flight behavior. This is true across a wide variety of behaviors and in a wide variety of species, including pigeons, mice, rats, cats, fish, monkeys, and baboons. Id. at Table 10A. The fact that these suppressive effects of THC are observed uniformly across species gives good reason to expect them to generalize to humans as well. A number of mechanisms have been proposed to account for these suppressive effects, including marijuana's tendency to yield calmness, passivity, lethargy, sedation (at high doses), and positive mood.[4]

In summary, there is no scientific evidence that marijuana use by an individual makes a person more likely to engage in violence or aggression, but strong scientific arguments can be made that the evidence indicates that use results in less aggression. More importantly in the present matter, though, is that there is absolutely no evidence of long term changes to aggressive

---

[4] See MICZEK, et al., and OSTROWSKY for a discussion of these hypotheses.

and violent tendencies caused by marijuana use or possession. Accordingly, the Commonwealth cannot meet its burden to support a lifetime ban for someone convicted forty or thirty years ago of marijuana possession.

### B. Plaintiff's Second Amendment Right Includes the Right to Purchase And Transport a Handgun To A Range to Maintain Proficiency

Plaintiff submits that any restriction imposed by § 131(d)(i)(e), the Chief of Police or the Commonwealth must comport with the core Second Amendment right to possess the handgun in the home, as well as the Second Amendment right to purchase a firearm and transport it to a designated range or other lawful location for the purpose of maintaining proficiency for lawful defensive confrontation. Plaintiff does not argue in the present case, as it is not required to reach a conclusion in this case, that his Second Amendment right includes the right to carry the firearm loaded and concealed or otherwise ready for immediate self-defense purposes. Plaintiff does argue, however, that at a minimum the Second Amendment right of self-defense also includes at least the right to purchase and to transport the arm the gun unloaded in a locked container to an appropriate practicing location to maintain proficiency.

Determining whether the ability to purchase a handgun and transport it to a range for practice again requires a two-step process: 1) The Court must determine whether the restricted activity falls within the scope of the Second Amendment; and 2) If it does, the Court must determine whether the restriction "infringes" on the Second Amendment right. See Peruta v. County of San Diego, at p. 8

As recently recognized and explained by both the Seventh and the Ninth Circuit, the text and history of the Second Amendment demonstrates that the right goes beyond the central right to possess of "keep" a handgun for self-defense inside one's home, but also protects the right to "bear" the arm in some fashion beyond the walls of the house. See, Peruta v. County of San Diego, (9th Cir., February 13, 2014); Moore v. Madigan, 702 F.3d 933 (7th. Cir. 2012 ); Ezell v. City of Chicago, 651 F.3d 684, 704 (7th Cir. 2011) As stated by the Seventh Circuit,

> The Court emphasized in [Heller and McDonald] that the 'central component' of the Second Amendment is the right to keep and bear arms for defense of self, family, and home. Heller, 554 U.S. at 599.128 S.Ct. 2783; McDonald, 130 S.Ct. at 3048. The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.

17

Several passages in <u>Heller</u> support this understanding. Examining post-Civil War legal commentaries to confirm the founding-era 'individual right' understanding of the Second Amendment, the Court quoted at length from the 'massively popular 1868 Treatise on Constitutional Limitations' by judge and professor Thomas Cooley: '[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them ...; it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order.' <u>554 U.S. at 616. 617-18.128 S.Ct. 2783</u> (internal quotation marks omitted); <u>see also id.</u> at 619, 128 S.Ct. 2783 ('No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right.' (quoting Benjamin Vaughan Abbott, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880))). <u>Ezell v. City of Chicago</u>, 651 F.3d 684, 704 (7th Cir. 2011).

The Ninth Circuit has also recognized that the Second Amendment right to "bear" extends beyond the inside of one's home. In <u>Peruta</u>, the Court stated that

in light of the plain-meaning definition of "bear Arms" elucidated above makes matters even clearer: the Second Amendment right "could not rationally have been limited to the home." <u>Moore</u>, 702 F.3d at 936. Though people may "keep Arms" (or, per <u>Heller</u>'s definition, "have weapons," 554 U.S. at 582) in the home for defense of self, family, and property, they are more sensibly said to "bear Arms" (or, <i>Heller</i>'s gloss: "carry [weapons] . . . upon the person or in the clothing or in a pocket," <i>id.</i> at 584) in <i>nondomestic</i> settings.4 <u>Kachalsky</u>, 701 F.3d at 89 n.10 ("The plain text of the Second Amendment does not limit the right to bear arms to the home."); <u>see also Drake v. Filko</u>, 724 F.3d 426, 444 (3d Cir. 2013) (Hardiman, J., dissenting) ("To speak of 'bearing' arms solely within one's home not only would conflate 'bearing' with 'keeping,' in derogation of the Court's holding that the verbs codified distinct rights, but also would be awkward usage given the meaning assigned the terms by the Supreme Court."). <u>Peruta v. County of San Diego</u>, at p.16.

Other courts have recently declared that the Second Amendment right extends beyond the four corners of the home. <u>See Moore v. Madigan</u>, 702 F.3d 933 (7th Cir. 2012); <u>People v. Aguilar</u> (Ill. 2013); <u>State v. Christian</u>, 307 P.3d 429 (Ore. 2013); <u>People v. Yanna</u>, 824 N.W.2d 241 (Mich. Ct. App. 2012) (dictum); <u>Ex parte Roque Cesar Nido Lanausse</u>, No. KLAN201000562 (P.R. Cir. 2011) (seeming to hold this view); <u>Hertz v. Bennett</u>, 751 S.E.2d 90 (Ga. 2013) and <u>State v. Shover,</u> (Ohio Ct. App. Feb. 5, 2014).

Regarding the historical basis for the premise that the scope of the Second Amendment right to "bear" arms extended beyond the inside of one's home, both the Seventh and the Ninth Circuits engaged in extensive historical review of nineteenth century case law. The Ninth Circuit concluded that "the majority of nineteenth century courts agreed that the Second Amendment right extended outside the home and included, at minimum, the right to carry an operable weapon in public for the purpose of lawful self-defense." Id. at 32.

Indeed, even a cursory review of historical cases reveals that early courts considered the ability to purchase and transport firearms in some manner an important aspect of Second Amendment rights. In Andrews v. State, 50 Tenn. 165, 8 Am. Rep. 8,13 (1871), the Court in striking down a pistol carrying statute as too restrictive held that "the right to keep arms for this purpose involves the right to practice their use.... The right to keep arms necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." Id. at 178. Andrews was cited several times in District of Columbia v. Heller, 128 S.Ct. 2783, at 2806, 2809, 2818 (2008). In Hill v. State, 53 Ga. 472 (1874), in interpreting the Georgia Constitution which tracked the Second Amendment, the Court held that "the words 'bear arms' must include the right to load them and shoot them and use them as such things are ordinarily used. . .." Id. at 480. Numerous other nineteenth century cases finding the right to "bear" arm extends beyond the four corners of one's home are cited in detail by both Peruta and Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012).

Finally, with regard to Plaintiff's right to purchase a handgun, it has been recognized that

> Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment ... . Heller endorsed 'laws imposing conditions and qualifications on the commercial sale of firearms.' 128 S.Ct. at 2817. In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under Heller. United States v. Marzzarella, 614 F.3d 85, Note 8 (3rd Cir.).

Plaintiffs seek to exercise their constitutional right to transport handguns in a locked unloaded condition to a proper practice area to maintain proficiency. Based on the above, it is evident that the right to purchase and transport to a range in some form are activities protected by

the Second Amendment.  Because §131(d)(i)(e) imposes a complete lifetime restriction on Plaintiffs from ever obtaining a Massachusetts LTC-A or LTC-B, the statute completely bars them from purchasing a handgun by commercial sale, as well as "bearing" a handgun to a range to maintain proficiency.[5]  This complete ban—or any subsequent condition on an LTC imposing such a ban— prohibiting a handgun purchase or transport to maintain proficiency imposed on Plaintiffs due to their non-violent misdemeanor possession conviction cannot be sustained by text and history analysis, strict scrutiny or even a "strong showing" analysis.  Accordingly, Plaintiff requests this Honorable Court to grant his Motion for Summary Judgment.

**CONCLUSION**

In conclusion, § 131(d)(i)(e) unconstitutionally groups together non-violent misdemeanants, violent misdemeanants, and felons. While prohibitions of felons and those convicted of violent domestic crimes may have historical constitutional basis, no such history or tradition exists for banning non-violent one-time misdemeanants such as Plaintiffs from exercising their inherent Second Amendment rights.  Furthermore, the basis for the categorical lifetime handgun ban for a non-violent conviction for marijuana possession thirty or forty years old has no relation to a legitimate and defined legislative purpose, and a link between marijuana use years prior and violence is not supported by the scientific literature.

Based on the foregoing analysis, Plaintiffs' Motion for Summary Judgment should be granted, and this Honorable Court should find that M.G.L. c. 140 § § 131(d)(i)(e) is unconstitutional for violating Plaintiffs' constitutional right to keep and bear arms.

> Plaintiffs, By Their Attorney,
> */s/ Jeffrey T. Scrimo*
> Jeffrey T. Scrimo
> Lynch Scrimo—Attorneys
> PO Box 1787
> Lenox, MA 01240
> BBO# 649864
> Jeff@LenoxAttorney.com

---

[5] Under the Massachusetts gun licensing scheme, only a holder of an LTC may transport a handgun outside of their home.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and served via email on this _28_ of _Feb_, 2014.

/s/ Jeffrey T. Scrimo