UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL WESSON; THOMAS WOODS; and
COMMONWEALTH SECOND AMENDMENT,
INC.,

                              Plaintiffs,

v.

TOWN OF SALISBURY, a municipal corporation;        CIVIL ACTION
THOMAS FOWLER, Chief of the Town of                No. 1:13-cv-10469-RGS
Salisbury Department of Police; TOWN OF
NATICK, a municipal corporation; JAMES HICKS,
Chief of the Town of Natick Department of Police,

                              Defendants.

COMMONWEALTH OF MASSACHUSETTS,

                              Intervenor-Defendant.

**MEMORANDUM OF THE COMMONWEALTH OF MASSACHUSETTS
IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

By its attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

William W. Porter, BBO No. 542207
Julia Kobick, BBO No. 680194
Assistant Attorneys General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2976
E-Mail: Bill.Porter@state.ma.us

Date:   April 4, 2014

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..............................................................................................................1

BACKGROUND ..............................................................................................................2

    I.     Massachusetts Firearms Licensing Framework ....................................... 2

    II.    Factual and Procedural History........................................................... 5

ARGUMENT ....................................................................................................................7

    I.     After *Heller*, States Retain Wide Latitude to Regulate the Possession and Use of Firearms................................................................................. 7

         A.    The Second Amendment Does Not Confer A Right to Possess or Carry Firearms Outside The Home............................................ 8

         B.    Massachusetts May Categorically Restrict or Prohibit the Possession of Firearms by Non-Law Abiding Citizens or By Citizens Who are Otherwise Unsuitable. .................................. 10

    II.    Massachusetts May, Consistent with the Second Amendment, Disqualify Persons From Firearms Possession Who Have Been Convicted of Violating a Law Regulating the Use, Possession or Sale of Controlled Substances....................................................................................... 12

         A.    The Commonwealth's Objective of Ensuring Public Safety and Preventing Crime is Vitally Important...................................... 13

         B.    The Restrictions in G.L. c. 140, § 131(d)(i)(e)  are Substantially Related to the Commonwealth's Interest in Preserving Public Safety and Preventing Crime. ................................................. 13

    III.    The Treatment of Marijuana Possession under Massachusetts Law Precludes the Commonwealth From Asserting that There is a Public Safety Threat in Permitting Wesson and Woods to Possess a Firearm in the Home for Self Defense.................................................................. 15

         A.    In Most Circumstances, Massachusetts Law Does Not Disqualify Persons from Firearms Licensure Based on a Single Violation, in Massachusetts, of the Laws Prohibiting Possession of Marijuana. .......... 15

         B.    In the Unique Circumstances of This Case, Massachusetts Law Does Not Evince a Public-Safety Interest That Is Advanced if the Plaintiffs Are Barred from Possessing a Firearm in the Home for Self-Defense............................................................................ 18

i

C.   This Court Need Not Determine Whether the Second Amendment
     Applies Outside the Home. ...................................................................... 19

CONCLUSION ............................................................................................................................20

## <u>INTRODUCTION</u>

Massachusetts law disqualifies individuals convicted of "a violation of any law regulating the use, possession or sale of controlled substances" from obtaining a license to carry firearms and a permit to purchase firearms. Mass. G.L. c. 140, §§ 131(d)(i)(e), 131A. The plaintiffs in this case, Michael Wesson and Thomas Woods, were denied licenses to carry and permits to purchase pursuant to those statutes because they were convicted over 30 years ago in Maine and Virginia, respectively, of possessing a small quantity of marijuana. They contend that sections 131(d)(i)(e) and 131A, as applied to them, violate their Second Amendment right to possess a firearm for purposes of self-defense in their homes.

The scope of the Second Amendment right, as articulated in <u>District of Columbia v. Heller</u>, 554 U.S. 570, 635 (2008), and <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020 (2010), is narrow. It does not prevent the government from prohibiting individuals from possessing firearms based on criminal convictions or general unsuitability. That is so because, even if such restrictions implicate the Second Amendment, they are substantially related to the government's important interest in preserving public safety and preventing crime. Accordingly, as a general matter, the Massachusetts Legislature's decision to disqualify individuals who have violated drug laws from firearms licensure satisfies constitutional scrutiny.

On the unique facts of this case, however, additional considerations apply. In 2009, Massachusetts decriminalized the possession of an ounce or less of marijuana. G.L. c. 94C, § 32L. Since then, state law may not "impose any form of penalty, sanction or disqualification" for this offense outside of section 32L. <u>Id</u>. And, since 1971, Massachusetts law has directed that a person convicted as a first-time offender for possession of marijuana shall usually be placed on probation and, if probation is successfully completed, "the case shall be dismissed and records shall be sealed." G.L. c. 94C, § 34. Once sealed, the conviction "shall not be deemed a

1

conviction for purposes of any disqualification or for any other purpose." <u>Id</u>.  Accordingly, had

Wesson and Wells' misdemeanor convictions for marijuana possession been entered in

Massachusetts (rather than Maine and Virginia), they might well be eligible today for the license

and permit they seek.  In these circumstances, Massachusetts law precludes an argument that

plaintiffs pose a risk to public safety if they possess a firearm in the home for self-defense.  For

that reason, the Commonwealth does not oppose the entry of narrowly drawn declaratory relief

in favor of the plaintiffs on their as-applied Second Amendment claim.

## BACKGROUND

### I.  Massachusetts Firearms Licensing Framework

"The goal of firearms control legislation in Massachusetts is to limit access to deadly

weapons by irresponsible persons.  Among the principal measures adopted in furtherance of that

goal are the provisions of G.L. c. 140, § 131, governing the licensing of persons to carry

firearms."  <u>MacNutt v. Police Comm'r of Boston</u>, 30 Mass. App. Ct. 632, 635, <u>rev. denied</u>, 410

Mass. 1104 (1991).

**Licenses to Carry**.  Massachusetts law establishes two categories of licenses for the

carrying and possession of firearms: Class A and Class B.  G.L. c. 140, § 131(a)–(b); <u>see Chardin</u>

<u>v. Police Comm'r of Boston</u>, 465 Mass. 314, 315-17, 989 N.E.2d 392, 395 (2013) (describing

statutory framework); <u>Hightower v. City of Boston</u>, 693 F.3d 61, 65–67 (1st Cir. 2012) (same).

Each form of license is issued by a "licensing authority," defined as either "the chief of police or

the board or officer having control of the police in a city or town, or persons authorized by

them," G.L. c. 140, § 121, or the colonel of the State police, <u>id.</u> § 131(d).  Holders of Class A and

B licenses may possess and carry "firearms," "rifles," or "shotguns" in their homes or in public.

Id. § 131(a), (b).[1]  Class A license holders may also (1) "carry or possess a loaded firearm in a concealed manner in any public place or way," and (2) obtain, possess, or carry any "large capacity" firearm, rifle, or shotgun.  Id.[2]  Class B license holders may not carry or possess a loaded and concealed firearm in public, but may openly possess and carry in public "large capacity shotguns and rifles" and "non-large capacity firearms."  Id. § 131(b).

A person seeking a Class A or B license must file an application with a licensing authority, which in turn determines whether the applicant is disqualified by statute from obtaining the license.  Id. § 131(d); Chardin, 989 N.E.2d at 395.  Certain categories of applicants are ineligible for a license to carry, including those who (1) have been convicted of a felony, a misdemeanor punishable by more than two years' imprisonment, certain violent crimes, and certain firearms-related offenses; (2) have been hospitalized from mental illness, unless a physician attests that the applicant is no longer disabled by it; (3) have been treated or confined for drug addiction or habitual drunkenness, unless deemed cured by a physician; (4) are less than 21 years old; or (5) are currently the subject of an abuse prevention restraining order or outstanding arrest warrant.  G.L. c. 140, § 131(d)(i)–(vii).  Relevant here, the statute also disqualifies applicants who have been convicted, "in any state or federal jurisdiction," of "a violation of any law regulating the use, possession or sale of controlled substances as defined in [G.L. c. 94C, § 1]."  Id. § 131(d)(i)(e).

---

[1] A "firearm" is, in general, a "pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged" and with a barrel less than 16 inches. G.L. c. 140, § 121.  A "rifle" is "a weapon having a rifled bore with a barrel length equal to or greater than 16 inches"; a "shotgun" is "a weapon having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches. . . ." Id.

[2] A "large capacity weapon" is, in general, "any firearm, rifle or shotgun" that is "semiautomatic with a fixed large capacity feeding device . . . or capable of accepting . . . any detachable large capacity feeding device."  G.L. c. 140, § 121.

If an applicant is not disqualified, the licensing authority may issue a license to carry if "it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason to fear injury to his person or property, or for any other reason." Id. § 131(d). A "suitable person" is, in general, "a sufficiently responsible person to be entrusted with a license to carry firearms." Hightower v. City of Boston, 822 F. Supp. 2d 38, 44 (D. Mass 2011), aff'd, 693 F.3d 61 (1st Cir. 2012). See Firearms Records Bureau v. Simkin, 466 Mass. 168, 993 N.E.2d 672 (2013) (discussing suitability requirement). The licensing authority may, in its discretion, issue the license to carry subject to restrictions. Id. § 131(a), (b). Applicants aggrieved by the denial of a license to carry are entitled to judicial review in state court. Id. § 131(f).

**Firearm Identification Card**. A licensing authority may also issue a firearm identification (FID) card, which is more limited than a Class A or B license. "An FID card allows the holder to own or possess a firearm within the holder's residence or place of business, but not to carry it to or in any other place." Commonwealth v. Powell, 459 Mass. 572, 587–88 (2011). See Chardin, 989 N.E.2d at 394, n. 5. To obtain an FID card, a person must submit an application to a licensing authority, which must issue the FID card unless the applicant is disqualified based on a prior conviction or another factor enumerated in the statute. G.L. c. 140, § 129B(1).[3] There is no suitability determination for an FID card; if an applicant is not in one of the disqualifying categories, the licensing authority "shall" issue the card. G.L. c. 140, § 129B.

**Purchase Requirements**. An individual who wishes to purchase a firearm, rifle, or shotgun may do so from a licensed dealer. G.L. c. 140, § 131E. Rifles and shotguns without

---

[3] Even with a prior conviction, an FID "applicant's right to possess a non-large capacity rifle or shotgun shall be deemed restored" if the conviction (or release from confinement) occurred at least five years before the application and the disqualifying conviction did not involve a "violent crime [as defined in G.L. c. 140, § 121] or a "crime involving the trafficking of controlled substances." G.L. c. 140 § 129B(1)(i).

semi-automatic capability may be purchased upon presentment of an FID card or a Class A or B

license to carry.  Id. § 131E(a).  Firearms and large-capacity rifles and shotguns with semi-

automatic capability may be purchased upon presentment of either a Class A or B license to

carry firearms, or an FID card together with a "permit to purchase."  Id. § 131E(b).  Permits to

purchase may be issued by a licensing authority after the authority determines that the firearm

will be purchased for a "proper purpose."  Id. § 131A.  Permit-to-purchase applicants must

possess the qualifications for obtaining a license to carry under G.L. c. 140, § 131.  Id.

## II.    Factual and Procedural History

Plaintiff Michael Wesson first obtained an FID card in 1993.  Pl. Ex. A, ¶¶ 5, 18.  Since

then, he has renewed his FID card regularly, most recently in 2012.  Pl. Ex. A, ¶ 5; Ex. G.

Wesson also held a license to carry firearms from 1988 to 1993.  Pl. Ex. A, ¶ 4; Ex. G.  In a 1993

renewal application, Wesson disclosed that, in 1973, he had been convicted in Maine of

possession of marijuana, in violation of Me. Rev. Stat. Ann. tit. 22, § 2383 (1972).  Pl. Ex. A, ¶

4; Ex. G.  Because he had been convicted of "a violation of any law regulating the . . . possession

. . . of controlled substances," as defined in Mass. G.L. c. 94C, § 1, Wesson was disqualified

from obtaining a license to carry and his renewal application was denied.  G. L. c. 140, §

131(d)(i)(e); Pl. Ex. A, ¶ 4.[4]  Wesson did not seek judicial review of the denial in state court.

In January 2013, Wesson wrote to defendant Thomas Fowler, Chief of the Salisbury

Police Department, requesting a permit to purchase a firearm under G.L. c. 140, § 131A.  Pl. Ex.

H, at 2.  The Salisbury Police Department denied Wesson's request because his marijuana

conviction disqualified him from obtaining a permit to purchase under G.L. c. 140, § 131A.  Pl.

---

[4] Section 1 of chapter 94C defines a "controlled substance" as "a drug, substance, or
immediate precursor in any schedule or class referred to in this chapter."  Marijuana is listed in
chapter 94C as a Class D controlled substance.  G.L. c. 94C, § 31.  Wesson's conviction for
possession of marijuana therefore ranks as a conviction for violating a law regulating the
possession of a controlled substance.

Ex. H, at 1.  In an affidavit, Wesson states that he wants a permit to purchase in order to "purchase and possess a handgun for self-defense in [his] home."  Pl. Ex. A, ¶ 21.

Plaintiff Thomas Woods first obtained an FID card in August 2011 from defendant James Hicks, Chief of the Natick Police Department.  Pl. Ex. B, ¶ 9; Ex. I, at 1–3.  He also applied in 2011 for a Class A license to carry firearms.  Pl. Ex. I, at 4–8.  His license-to-carry application indicated that he had never been convicted of possessing controlled substances, but had been charged in Virginia in 1983 with possession of marijuana.  Id. at 8.  Woods recalled that the judge in the Virginia case said it was Woods' "lucky day" and pronounced the "case dismissed." Id.  Nevertheless, a background check revealed that a conviction for possession of marijuana was entered against Woods in Virginia, and that Woods paid at $10 fine.  Pl. Ex. B, ¶ 3.  Because of this conviction, he was ineligible for a Class A license to carry under G.L. c. 140, § 131(d)(i)(e), and his application was denied.  Id. ¶ 8.  Woods did not seek review of the denial in state court.

In February 2013, Woods emailed the Natick Police Department to request a permit to purchase under G.L. c. 140, § 131A.  Pl. Ex. K, at 2.  His request, like Wesson's, was denied in light of his conviction for possession of marijuana.  Id.  Woods has also sworn in an affidavit that he wishes to "purchase and possess a handgun for self-defense in [his] home."  Pl. Ex. B, ¶ 12.

Wesson and Woods filed this lawsuit claiming that, as applied to them, the license-to-carry and permit-to-purchase statutes, G.L. c. 140, §§ 131(d)(i)(e) and 131A, violate the Second Amendment.  They contend that Massachusetts may not deny them licenses to carry and permits to purchase based on a single, decades-old, misdemeanor conviction for unlawful possession of marijuana.  This Court granted the Commonwealth's motion to intervene pursuant to 28 U.S.C. § 2403(b) and Fed. R. Civ. P. 24(a)(1).

**ARGUMENT**

**I.**     **After *Heller*, States Retain Wide Latitude to Regulate the Possession and Use of Firearms.**

In District of Columbia v. Heller, the Supreme Court held that the Second Amendment

protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and

home." 554 U.S. 570, 635 (2008). A total "ban on handgun possession in the home," the Court

ruled, "violates the Second Amendment, as does [a] prohibition against rendering any lawful

firearm in the home operable for the purpose of immediate self-defense." Id. The Court ordered

the District of Columbia to allow Heller "to register his handgun and [to] issue him a license to

carry it in the home," if Heller was not otherwise disqualified from the exercise of Second

Amendment rights. Id. Two years later, the Court ruled that the limited right recognized in

Heller, the "right to possess a handgun in the home for the purpose of self-defense," applies to

the States through the Fourteenth Amendment. McDonald v. City of Chicago, 130 S. Ct. 3020,

3050 (2010) (plurality); id. at 3059 (Thomas, J. concurring in part and concurring in the

judgment).

After Heller and McDonald, "[t]he weight of the right to keep and bear arms depends not

only on the purpose for which it is exercised but also on relevant characteristics of the person

invoking the right." United States v. Carter, 669 F.3d 411, 415 (4th Cir. 2012). Heller and

McDonald involved only the right of (1) law abiding, responsible citizens to (2) possess and

carry handguns in the home for self-defense. Congress and state legislatures retain wide latitude

to prohibit the possession of firearms by irresponsible or non-law abiding citizens and to restrict

firearm possession and use outside the home.

**A.     The Second Amendment Does Not Confer A Right to Possess or Carry
Firearms Outside The Home.**

Although the Supreme Court has held that the Second Amendment forbids laws that bar
responsible, law-abiding citizens from keeping an operable handgun in their home for self-
defense, the Court has not recognized any constitutional right to carry a firearm outside the
home.  See Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 89 (2d Cir. 2012), cert. denied, 133
S. Ct. 1806 (2013) ("What we know from [Heller and McDonald] is that Second Amendment
guarantees are at their zenith within the home."); Hightower, 693 F.3d at 72 ("possession of
operative firearms for use in defense of the home constitutes the 'core' of the Second
Amendment); United States v. Masciandaro, 638 F.3d 458, 467, 474–76 (4th Cir.), cert. denied,
132 S. Ct. 756 (2011).  The First Circuit has declined to decide whether the Second Amendment
covers firearm possession outside the home.  Hightower, 693 F.3d at 72 n. 8.[5]

The Supreme Court has stressed that "'the need for defense of self, family, and property
is most acute' in the home."  McDonald, 130 S. Ct. at 3036 (majority) (quoting Heller, 554 U.S.
at 628).  "[A]s we move outside the home," however, "firearm rights have always been more
limited, because public safety interests often outweigh individual interests in self-defense."
Masciandaro, 638 F.3d at 470.  Accord Hightower, 693 F.3d at 72–73.  Thus, the Heller Court
may have "wished to leave open the possibility that [the] danger [of mayhem] would rise
exponentially as one moved the [Second Amendment] right from the home to the public square."
Masciandaro, 638 F.3d at 475–76.  This case does not, however, raise a question of extending

---

[5] The Second, Third, and Fourth Circuits likewise have not reached the question whether the
Second Amendment applies outside the home.  See Kachalsky, 701 F.3d at 89; Drake v. Filko,
724 F.3d 426, 431 (3d Cir. 2013); Woollard v. Gallagher, 712 F.3d 865, 876 (4th Cir. 2013).
The Seventh and Ninth Circuits, however, have held that the Second Amendment protects armed
self-defense outside the home.  See Moore v. Madigan, 702 F.3d 933, 936–37 (7th Cir. 2012);
Peruta v. County of San Diego, 742 F.3d 1144, 1166 (9th Cir. 2014) (petition for rehearing en
banc pending).

<u>Heller</u> because the plaintiffs claim only a right to purchase and possess a firearm in the home for purposes of self-defense.  Pl. Ex. A, ¶ 21; Ex. B, ¶12.

Another "important limitation" recognized in <u>Heller</u> is that the Second Amendment only protects possession of "the sorts of weapons protected . . . 'in common use at the time'" the amendment was enacted.  <u>Heller</u>, 554 U.S. at 627 (quoting <u>United States v. Miller</u>, 307 U.S. 174, 179 (1939)).  "[D]angerous and unusual" weapons—including "M-16 rifles and the like"—"may be banned" without violating the Second Amendment.  <u>Id.</u>  Furthermore, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." <u>Id.</u> at 625.  Because firearms with "large capacity ammunition feeding devices" were not in common use in the eighteenth century, are unusually dangerous, and are typically not needed for lawful purposes, the Second Amendment does not protect possession or carrying of such weapons.  <u>Heller v. District of Columbia</u>, 698 F. Supp. 2d 179, 193–95 (D.D.C. 2010), <u>aff'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 670 F.3d 1244, 1260–64 (D.C. Cir. 2011) (upholding new firearm licensing ordinance passed after Supreme Court decision); <u>accord</u> <u>United States v. Fincher</u>, 538 F.3d 868, 873–74 (8th Cir. 2008), <u>cert.</u> <u>denied</u>, 129 S. Ct. 1369 (2009) (same for machine guns).[6]

Even where courts have assumed, without deciding, that the Second Amendment might have some application outside the home, they have held that there is no general Second Amendment right to carry a concealed weapon.  As the First Circuit recently held, "[l]icensing of the carrying of concealed weapons is presumptively lawful."  <u>Hightower</u>, 693 F.3d at 73–74. <u>See</u> <u>also</u> <u>United States v. Rene E.</u>, 583 F.3d 8, 12 (1st Cir. 2009) ("laws prohibiting the carrying of concealed weapons" are an "example[] of 'longstanding' restrictions that [are] 'presumptively lawful' under the Second Amendment" (quoting <u>Heller</u>, 554 U.S. at 626)); <u>Peterson v. Martinez</u>,

---

[6]  Accordingly, Wesson's passing reference to desiring a "semi-automatic" rifle for hunting does not implicate a Second Amendment right.  Pl. Ex. A ¶¶ 6, 21.

707 F.3d 1197, 1121 (10th Cir. 2013) (upholding the denial of a concealed handgun license to an out-of-state resident because "the Second Amendment does not confer a right to carry concealed weapons"). Indeed, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." Heller, 554 U.S. at 626. See also Kachalsky, 701 F.3d at 95 ("[m]ost states enacted laws banning the carrying of concealed weapons" in the 19th century).

### B.     Massachusetts May Categorically Restrict or Prohibit the Possession of Firearms by Non-Law Abiding Citizens or By Citizens Who are Otherwise Unsuitable.

Heller explained that "the right secured by the Second Amendment," extends only to "law abiding, responsible citizens" and "is not unlimited." 554 U.S. at 626, 635. In particular, the Court cautioned:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626–27. Those "presumptively lawful regulatory measures," the Court continued, were "only . . . examples" and not an "exhaustive" list. Id. at 627, n. 26. See McDonald, 130 S. Ct. at 3047 (plurality) (Heller did not "imperil every law regulating firearms"); Rene E., 583 F.3d at 12 (Second Amendment rights are "not unlimited"). See also United States v. Marzzarella, 614 F.3d 85, 92–93 (3d Cir. 2010) (the Second Amendment leaves intact "additional classes of restrictions" beyond those identified in Heller).

Similarly, "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." United States v. Booker, 644 F.3d 12, 23 (1st Cir. 2011). In passing laws, legislatures must make predictive judgments about future behavior, and "some

10

categorical disqualifications" are both inevitable and "permissible."  United States v. Skoien, 615

F.3d 638, 641 (7th Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1674 (2011).  See, e.g., Chardin,

989 N.E.2d at 327–29 (upholding categorical disqualification under G.L. c. 140, § 131(d) based

on license-to-carry applicant's juvenile adjudication for unlicensed possession of a firearm).

  Since Heller, courts have rejected a range of Second Amendment challenges to statutes

that categorically limit the rights of misdemeanants to possess and carry firearms.  In United

States v. Booker, the First Circuit, joining the Seventh Circuit, upheld 18 U.S.C. § 922(g)(9),

which categorically forbids any person "who has been convicted in any court of a misdemeanor

crime of domestic violence" from possessing a firearm transported in interstate commerce.  644

F.3d at 26.  See Skoien, 614 F.3d at 640–45.  Similarly, the D.C. Circuit held that 18 U.S.C.

§ 922(g)(1), prohibits firearm possession by persons convicted of common-law misdemeanors,

so long as the "crime [was] punishable by imprisonment for a term exceeding one year,"

regardless of whether any prison sentence was imposed and, as so construed, the law does not

violate the Second Amendment.  Schrader v. Holder, 704 F.3d 980, 991 (D.C. Cir. 2013).

  Courts have also confirmed that the Second Amendment does not imperil categorical

disqualifications based on non-violent conduct.  Section 922(g)(1), for example, prohibits

persons convicted of violent and non-violent conduct alike from possessing a firearm, so long as

they were convicted of a crime punishable by a term of imprisonment exceeding one year.  18

U.S.C. § 922(g)(1).  The provision, which covers "individuals convicted of crimes as disparate as

tax evasion . . . and bank robbery," Booker, 644 F.3d at 24 n. 14, was among the

disqualifications identified in Heller as "presumptively lawful."  Id. at 23–24.  A different

provision of the same statute, 18 U.S.C. § 922(g)(3), makes it unlawful for a person who is "an

unlawful user of or addicted to any controlled substance" to possess a gun.  The use of controlled

substances targeted in § 922(g)(3) does not involve violence, nor even a criminal conviction for

violating controlled substances laws, but courts of appeals have nevertheless upheld the statute against Second Amendment challenges.  United States v. Dugan, 657 F.3d 998, 999–1000 (9th Cir. 2011); United States v. Yancey, 621 F.3d 681, 687 (7th Cir. 2010) (per curiam); United States v. Seay, 620 F.3d 919, 925 (8th Cir. 2010); United States v. Patterson, 431 F.3d 832, 835–36 (5th Cir. 2005) (upholding § 922(g)(3) under pre-Heller Fifth Circuit precedent that recognized an individual right to bear arms).  See also Carter, 669 F.3d at 421 (strongly suggesting that the court will uphold § 922(g)(3), but remanding to develop the record).

Common to all of these cases is the principle that, even in the home, categorical restrictions on firearms possession by non-law abiding or otherwise unfit citizens survive constitutional scrutiny when there is a substantial relationship between the restriction and an important government interest.  Legislatures are "not limited to case-by-case exclusions" based on individual conduct but may, as Massachusetts does, disqualify a class of persons from access to firearms when there is an important reason to do so.  Yancey, 621 F.3d at 683.

## II.   Massachusetts May, Consistent with the Second Amendment, Disqualify Persons From Firearms Possession Who Have Been Convicted of Violating a Law Regulating the Use, Possession or Sale of Controlled Substances.

In cases involving a categorical restriction on firearms possession based on a prior conviction, many courts have assumed for purposes of decision (but without deciding the issue) that Second Amendment rights are implicated.  E.g., Schrader, 704 F.3d at 989; Hightower, 693 F.3d at 72 n. 8; Booker, 644 F.3d at 25 n. 17.  Based on that assumption, courts have evaluated the restriction by "applying an appropriate form of means-end scrutiny," Woollard v. Gallagher, 712 F.3d 865, 875 (4th Cir. 2013), that requires a "strong showing" of "a substantial relationship between the restriction and an important governmental objective."  Booker, 644 F.3d at 25.

As discussed, the Commonwealth disqualifies individuals who have violated controlled substances laws from obtaining a license to carry or a permit to purchase.  G.L. c. 140,

§ 131(d)(i)(e).[7]  This restriction exists to protect public safety and prevent crime, objectives that plainly rank as "important" and that have a strong relationship to ensuring public safety and keeping firearms away from people who have flouted drug laws.  The plaintiffs do not seek to invalidate § 131(d)(i)(e) on its face or challenge the broad principles that support the restriction.

>    **A.      The Commonwealth's Objective of Ensuring Public Safety and Preventing Crime is Vitally Important.**

"The historical aim of licensure" in Massachusetts "is preservation of public health, safety, and welfare by extending the public trust only to those with proven qualifications." Chardin, 989 N.E.2d at 394 (internal quotation marks omitted).  Because "the statute governing who may lawfully carry a firearm directly affects the physical safety of the citizenry," the Legislature and courts regard the public interest in firearms licensure as "of the utmost importance." Dupont, 786 N.E.2d at 399.  Other Courts uniformly agree that the government's interest in preventing crime and ensuring the public safety is important.  See, e.g., United States v. Salerno, 481 U.S. 739, 750 (1987) (the "general interest in preventing crime is compelling"); Schrader, 704 F.3d at 989–90 ("'[t]he principal purpose of the federal gun control legislation'"— "'to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency'"—is "obviously 'important'" (quoting Huddleston v. United States, 415 U.S. 814, 824 (1974)); Skoien, 614 F.3d at 642 ("[N]o one doubts that . . . preventing armed mayhem[] is an important governmental objective.").

>    **B.      The Restrictions in G.L. c. 140, § 131(d)(i)(e)  are Substantially Related to the Commonwealth's Interest in Preserving Public Safety and Preventing Crime.**

The Commonwealth's exclusion of individuals who have violated controlled substances laws from licenses to carry and permits to purchase is substantially related to its interest in

---

[7]   This conduct also disqualifies individuals from obtaining an FID card.  In certain circumstances the disqualification may later be removed, at least in part.  See supra note 3.

promoting public safety and preventing crime.  By this disqualification, sections 131(d)(i)(e) and 131A aim "to limit access to deadly weapons by irresponsible persons."  Ruggiero v. Police Comm'r of Boston, 18 Mass. App. Ct. 256, 258, 464 N.E.2d 104, 106 (1984).  As the Massachusetts Appeals Court has explained, the "Legislature could have concluded that there was an urgent need to remove weapons from the hands of those whose criminal records indicate that they have flouted the law in the past."  Dupont, 786 N.E.2d at 399.  Section 131, in particular, "was enacted as a first-line measure in the regulatory scheme," and springs from the "realization that prevention of harm is often preferable to meting out punishment after an unfortunate event."  Ruggiero, 464 N.E.2d at 106.

The Legislature's determination that persons convicted of controlled substances offenses pose a heightened risk of misusing firearms is validated widely by courts, rests on a solid empirical foundation, and tracks common sense.  In analogous Second Amendment challenges to 18 U.S.C. § 922(g)(3), which disqualifies habitual drug users from firearms possession, courts have easily recognized the link between use of unlawful drugs and heightened public safety concerns.  See, e.g., Yancey, 621 F.3d at 686 ("Ample academic research confirms the connection between drug use and violent crime.  For example, nearly four times as many adults arrested for serious crimes had used an illegal drug in the previous year than had not." (citing studies)); Dugan, 657 F.3d at 999 ("[W]e see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so."); United States v. Edmond, 2012 WL 4964506, *5 (D. Me. 2012) ("[P]rohibiting unlawful drug users from possessing firearms is substantially related to the important government objective of reducing gun violence.").

14

**III.    The Treatment of Marijuana Possession under Massachusetts Law Precludes the Commonwealth From Asserting that There is a Public Safety Threat in Permitting Wesson and Woods to Possess a Firearm in the Home for Self Defense.**

    **A.    In Most Circumstances, Massachusetts Law Does Not Disqualify Persons from Firearms Licensure Based on a Single Violation, in Massachusetts, of the Laws Prohibiting Possession of Marijuana.**

The plaintiffs in this case bring a narrow as-applied challenge to one feature of Massachusetts' firearms licensing scheme.[8]  Plaintiffs contend that, in violation of the Second Amendment right recognized in <u>Heller</u>, they have been "permanently barred from possession of a handgun in their home for the purposes of self-defense" in Massachusetts because they were long ago convicted of unlawfully possessing a small amount of marijuana in States that do not authorize sealing of their convictions.  Mem. in Support of Pl.s' Mot. for Summ. J., at 6.

Wesson and Woods were convicted over 30 and 40 years ago, respectively, of possession of small quantities of marijuana.  Each was required to pay a fine, without imposition of probation or a jail term.  Neither has been convicted of violating any other criminal law, including any other controlled substances law.  Both have FID cards but, in light of their marijuana convictions, cannot obtain a permit to purchase in order to buy a handgun in the

---

[8] Any claims asserted by plaintiff Commonwealth Second Amendment, Inc. ("Comm2A") should be dismissed for lack of standing.  "To establish standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling."  <u>Horne v. Flores</u>, 557 U.S. 433, 445 (2009).  When, as here, the plaintiff is an organization, it must demonstrate that "(1) at least one of its members would have standing to sue as an individual, (2) 'the interests at stake are germane to the organization's purpose,' and (3) individual members' participation is not necessary to either the claim asserted or the relief requested."  <u>Animal Welfare Inst. v. Martin</u>, 623 F.3d 19, 25 (1st Cir. 2010) (quoting <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000)).  In this case, there is no evidence that Wesson and Woods are members of Comm2A, nor is there evidence that any of Comm2A's members have been denied a license to carry or permit to purchase based on a single out-of-state conviction for possession of marijuana.  Comm2A's standing therefore fails from the outset.  <u>See</u> <u>Fletcher v. Haas</u>, 851 F. Supp. 2d 287, 291 (D. Mass. 2012) (plaintiff organizations lacked standing because they did not establish that any of their members would have individual standing to sue).

Commonwealth.  See G.L. c. 140, § 131A (licensing authority may grant a permit to purchase, rent or lease a firearm to "a person qualified to be granted a license [under § 131]"); § 131(d)(i)(e) (license to carry may not issue to person convicted of a violation of "any law regulating the use, possession or sale of controlled substances as defined in section 1 of chapter 94C").  Both Wesson and Woods emphasize that they wish to purchase a handgun for purposes of self-defense in their homes.  Pl. Ex. A ¶¶ 6, 21; Ex. B ¶¶ 8, 10.

Had the plaintiffs been arrested in Massachusetts for identical conduct, state law would, generally, have required that they be placed on probation with the case dismissed, and the records sealed, if the term of probation was completed successfully.  General Laws chapter 94C, section 34 forbids "knowingly or intentionally . . . possess[ing] a controlled substance," and generally sets the maximum punishment at one year in prison and/or a fine of not more than $1,000.  But "[a]ny person who is convicted for the first time under this section for the possession of marihuana . . . who has not previously been convicted of any offense [under chapter 94C or a similar provision of prior law] . . . shall be placed on probation unless such person does not consent thereto, or unless the court files a written memorandum stating the reasons for not so doing.  Upon successful completion of said probation, the case shall be dismissed and records shall be sealed."   G.L. c. 94C, § 34, added by Mass. St. 1971, c. 1071, § 1.[9]  If a conviction is ordered sealed pursuant to § 34, it "shall not be deemed a conviction for purposes of any disqualification or for any other purpose."  Id.  See Chief of Police of Shelburne v. Moyer, 16 Mass. App. Ct 543, 545, 453 N.E.2d 461, 463-64 (1983) (police chief did not

---

[9] The statute also permits an offender, after a single, first-offense conviction for possession of a controlled substance other than marijuana, to petition a court to seal his record.  If the person "had his case continued without a finding to a certain date, or has been convicted and placed on probation," and did not violate any condition of the continuance or probation, the court may dismiss the proceedings and "order sealed all official records relating to his arrest, indictment, conviction, probation, continuance or discharge pursuant to this section."  G.L. c. 94C, § 34.

dispute that a conviction sealed under G.L. c. 94C, § 34 may not serve as a basis for

disqualifying an applicant from obtaining a license to carry); Op. Atty Gen., July 19, 1978, p. 89,

n. 9, 1978 WL 34075 (record of conviction under G.L. c. 94C, § 34, which a court has ordered

sealed, "is not to be used to disqualify a person for any purpose" and commissioner of probation

was not required to disseminate this information to a police chief in gun licensing inquiry).

Thus, persons who were convicted in Massachusetts of first-offense possession of marijuana, and

who had their convictions sealed, may obtain a license to carry, a permit to purchase, or an FID

card if they meet all other statutory requirements.

Moreover, in the November 2008 election Massachusetts voters approved a ballot

initiative that prospectively decriminalized possession of one ounce or less of marijuana. See

G.L. c. 94C, § 32L.  Although possession of an ounce or less of marijuana remains a civil

infraction, "neither the Commonwealth nor any of its political subdivisions . . . may impose any

form of penalty, sanction or disqualification on an offender for possessing an ounce or less of

marihuana."  Id.  Accordingly, since 2009, persons cited for possession of marijuana under § 32L

are not (for that reason) barred from obtaining a license to carry, permit to purchase or FID card.

Wesson and Woods were convicted of possession of small quantities of marijuana in

Maine and Virginia, respectively.  It appears that neither State provides a process to have the

conviction expunged or sealed in these circumstances.  See Va. Code Ann. § 19.2-392.2I; Pl.

Ex. Q (no sealing statute in Maine).  Had plaintiffs been convicted of the same conduct in

Massachusetts they would have been eligible for sealed convictions under § 34, by which they

could avoid disqualification from firearms licensure.  Plaintiffs' out-of-state convictions,

however, disqualify them from a license to carry or permit to purchase under the express terms of G.L. c. 140, §§ 131(d) and 131A.[10]

> **B.**  **In the Unique Circumstances of This Case, Massachusetts Law Does Not Evince a Public-Safety Interest That Is Advanced if the Plaintiffs Are Barred from Possessing a Firearm in the Home for Self-Defense.**

As explained on pages 15–17, above, Massachusetts law discourages, or prohibits, the imposition of enduring collateral consequences on persons cited for, or convicted once of, possession of a small amount of marijuana.  In particular, (1) individuals with one sealed conviction in Massachusetts for possession of marijuana, and (2) individuals cited for possession of an ounce or less of marijuana in Massachusetts after 2009 are not statutorily disqualified from obtaining a permit to purchase under G.L. c. 140, § 131A, a license to carry under § 131(d), or an FID card under § 129B.[11]  In these respects, the Commonwealth's marijuana possession laws do not treat one-time offenders as a public-safety risk.  Cf. Gordon v. Registry of Motor Vehicles, 75 Mass. App. Ct. 47, 912 N.E.2d 9 (2009) (in Melanie's Law, the Legislature determined that all repeat OUI offenders pose a danger to public safety, and so they are all subject to the ignition interlock device requirement).

Accordingly, the Commonwealth's treatment of persons convicted or cited for possession of marijuana precludes an argument that the plaintiffs pose a risk to public safety if they possess a firearm in the home for self-defense or, in any case, that they pose a greater hazard than

---

[10] Where such a construction is permissible, the Supreme Judicial Court has sought to find consistency in the firearms laws' treatment of residents and non-residents.  See Firearms Records Bureau v. Simkin, 466 Mass. 168, 993 N.E.2d 672 (2013) ("suitable person" standard applies to revocation of resident and nonresident licenses to carry, even though the standard is not specifically mentioned in the non-resident provisions).  In present case, however, the plain language of § 131(d) required the police chiefs of Salisbury and Natick to find plaintiffs disqualified.

[11] Of course, these individuals remain subject to other statutory disqualifications and may only obtain a license to carry if found suitable by the licensing authority.

applicants with a single *in-state* marijuana-possession conviction who are not disqualified.  In

light of the anomaly in Massachusetts' licensing scheme highlighted by this as-applied

challenge, the Commonwealth does not take the position that disqualification of the plaintiffs is

"substantially related" to an interest in preserving public safety and preventing crime, as that

interest is articulated in state law.  See Booker, 644 F.3d at 25 (setting out framework for means-

ends scrutiny of law under the Second Amendment).  For that reason, the Commonwealth does

not oppose a narrowly drawn declaratory judgment stating that, as applied to these plaintiffs,

§§ 131(d)(i)(e) and 131A infringe the Second Amendment right to possess firearms in the home

for self-defense.

      **C.**    **This Court Need Not Determine Whether the Second Amendment Applies
Outside the Home.**

The plaintiffs also contend that the Second Amendment right of responsible, law-abiding

citizens to "possess a handgun in the home for the purpose of self-defense," McDonald, 130

S. Ct. at 3050, guarantees an additional right to transport a firearm to a firing range for the

purpose of maintaining proficiency.  Mem. in Support of Pl.s' Mot. for Summ. J., at 17–19.  In

so arguing, plaintiffs ask this Court to enlarge the Second Amendment well beyond the scope of

the right recognized in Heller and McDonald.

For at least two reasons, this Court need not, and should not, break new ground in this

case on whether the Second Amendment protects any right to carry firearms outside the home to

a firing range.  First, Massachusetts law allows individuals with FID cards, like the plaintiffs, to

use large-capacity and non-large capacity firearms stored at licensed shooting ranges.  See G.L.

c. 140, § 129B(6)(i)–(ii) (authorizing FID card holders to possess firearms "under a Class A

license issued to a shooting club . . . or under the direct supervision of a holder of a Class A [or

Class B] license issued to an individual . . . at an incorporated shooting club or licensed shooting

range").  Thus, with their FID cards alone, plaintiffs can maintain proficiency in handling firearms by practicing at any licensed shooting range in the Commonwealth.

Second, this case can be fully resolved by applying the Second Amendment as it has been defined by the Supreme Court and First Circuit.  The plaintiffs, themselves, stress that they seek to vindicate a right to possess a firearm in the home for self-defense.  For that reason, this Court should not address the difficult and unresolved question whether the Second Amendment applies outside the home.  See Masciandaro, 638 F.3d at 475 ("On the question of Heller's applicability outside the home environment, we think it prudent to await direction from the Court itself. . . . The whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree."); Davis v. Grimes, ---F. Supp. 2d---, 2014 WL 1278082, *15 (D. Mass. Mar. 26, 2014) (declining to rule on scope of Second Amendment).  And, in any event, for all the reasons previously discussed, see supra, at 8–10, the Second Amendment does not guarantee a right to carry firearms outside the home.

## CONCLUSION

For the foregoing reasons, if the Court determines to grant relief, it should declare only that, as applied to these plaintiffs, G.L. c. 140, §§ 131(d)(i)(e) and 131A infringe the Second Amendment right to possess firearms in the home for self-defense.

By its attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

____/s/ William W. Porter_____
William W. Porter, BBO No. 542207
Julia Kobick, BBO No. 680194
Assistant Attorneys General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2976
E-Mail: Bill.Porter@state.ma.us

Date:   April 4, 2014

CERTIFICATE OF SERVICE

I hereby certify that the above document will be served on April 4, 2014, by electronic notice for registered counsel and a copy will be served by first-class mail, postage pre-paid, for non-registered counsel.

/s/ William W. Porter
William W. Porter
Assistant Attorney General